**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

IN RE NEWSDAY LITIGATION

**REPORT AND**
**RECOMMENDATION**
**08-MC-096 (JBW)**

-----------------------------------------------------------X

GOLD, S., *United States Magistrate Judge*:

## INTRODUCTION

This Report and Recommendation is issued in connection with nine pending related criminal actions. The nine cases arise out of fraudulent schemes to overstate the paid circulation of Newsday and Hoy, newspapers published by wholly-owned subsidiaries of the Tribune Company ("Tribune") at the time. It appears that the point of the circulation fraud was to maintain advertising revenues during a period of declining circulation by creating the appearance, through a variety of means, that Newsday's and Hoy's paid circulation was greater than it in fact was.

Seven of the nine defendants in the related criminal actions were employees in the circulation departments of Newsday and Hoy, and two were independent contractors who distributed copies of Newsday. Robert Brennan was Newsday's circulation director; Ed Smith, the ABC liaison for Newsday and Hoy; Robert Garcia, single copy manager for Hoy and circulation manager for Newsday; Richard Czark, Senior Vice President of circulation for Hoy in Chicago and Los Angeles; Louis Sito, at various times Vice President of Circulation for Newsday and Publisher of Hoy; Dennis Springer, a manager of home delivery for Newsday and Hoy; Dorothy McKillop, holder of various positions with Newsday, including manager of home delivery on Long Island and director of single-copy sales on Long Island; Gus Acosta, a principal

of a company that distributed Newsday and Hoy; and John Faiella, a principal of a company hired by Newsday as a home delivery agent. On December 29, 2005, Robert Brennan waived indictment and entered a plea of guilty to a felony information charging him with conspiring to commit mail fraud. Ed Smith did the same in April of 2006. Robert Garcia offered a similar plea in May of 2006, as did Richard Czark, Louis Sito, Gus Acosta (unlike the other defendants, Acosta pled guilty to a substantive count of mail fraud rather than a conspiracy charge), Dennis Springer, John Faiella, and Dorothy McKillop. Each of the defendants is awaiting sentence. The government has submitted letters pursuant to Section 5K1.1 of the Sentencing Guidelines on behalf of each of the nine defendants other than Czark.

The fraud was massive, resulting in losses affecting tens of thousands of victim advertisers in an amount originally estimated by Tribune itself as exceeding eighty million dollars. The charging documents generally allege that the fraud continued for almost four years, from January of 2000 through July of 2004. Despite the scope of the fraud and the number of defendants eligible for 5K1.1 letters, no indictments were brought against Tribune, Newsday or Hoy, and no charges were brought against any individual with a title higher than Senior Vice President, Director or Manager.[1]

The United States Attorney for this district has entered into an agreement with Newsday, Inc. and Hoy Publications, LLC, executed on behalf of Newsday and Hoy by Tribune on December 17, 2007. *See* Docket Entry 12-2 in 05-CR-747. In the agreement, Newsday and Hoy each admit that they

---

[1]These facts are taken largely from the charging documents lodged against each of the defendants and the "Offense" sections of the pre-sentence investigation reports prepared by the court's Probation Department.

> violated federal criminal law by engaging in schemes that
> defrauded their advertisers, by systematically inflating paid
> circulation numbers reported in their books and records and falsely
> representing the accuracy of the inflated numbers to the Audit
> Bureau of Circulations ("ABC"), an industry organization.

*Id.* ¶ 2. Newsday and Hoy further acknowledge in the agreement that they have made payments "of approximately $83 million, to date, to entities that placed ads in Newsday and Hoy in settlement of pending or potential claims" related to the circulation fraud. *Id.* ¶ 8(e). In addition, both Newsday and Hoy have agreed to pay $15 million to settle a civil forfeiture action commenced by the United States. *Id.* ¶ 6. The agreement provides that in consideration, among other things, of their payment of $83 million to victims and forfeiture of $15 million to the United States, "neither Newsday nor Hoy will be prosecuted" for the circulation fraud. *Id.* ¶ 8. The agreement also requires Newsday and Hoy to cooperate fully with the government's investigation of the circulation fraud. *Id.* ¶ 5.

Before imposing sentence, Senior United States District Judge Jack B. Weinstein has asked for a Report and Recommendation that, "[t]o the extent practicable, determine[s] the identity of victims affected by the crimes of defendants, the amount of money each is entitled to, and how much, if any each has received in civil litigation or otherwise." Docket Entry 16 in 05-CR-747. In that regard, I have received submissions from Tribune, including an affidavit of Carl DeMarco, Revenue Accounting Manager in the Finance Department at Newsday ("DeMarco Aff."). *See* Docket Entry 29 in 05-CR-747. In addition, the government has submitted a report prepared by Dr. Charles J. Romeo of the Economic Analysis Group at the United States

Department of Justice. *See* Docket Entry 16 in 08-MC-096.[2] A group of automobile dealer advertisers, plaintiffs in a putative class action, a restaurant owner, and a former Newsday employee, Gerard Schultz, have also filed submissions with the court. *See* Docket Entries 30, 43 in 05-CR-747; Docket Entries 14, 31 in 08-MC-096. The court has also received letters from concerned individuals who do not claim to be victims or otherwise directly connected to this case. *See* Docket Entries 3, 6 in 08-MC-096. On June 6, 2008, I conducted a hearing at which the government's expert, Dr. Romeo, testified. Counsel for each defendant, and counsel for the sole victim present at the hearing, were afforded the opportunity to question Dr. Romeo. Finally, I have received post-hearing memoranda from the government, certain defendants, and Schultz. Docket Entries 36, 38, 39, 40 in 08-MC-096.

## DISCUSSION

### A. Legal Standards Governing Restitution

The Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A-3664, requires that a court order a defendant convicted of fraud or conspiracy to commit fraud to make restitution to his victims. 18 U.S.C. § 3663A(c). Restitution is mandatory under the MVRA unless the victims can not be identified or are so numerous, or the determination of their losses so complex, that restitution is impracticable. 18 U.S.C. § 3663A(c)(3); *see also U.S. v. Catoggio*, 326 F.3d 323, 326 (2d Cir. 2003). Restitution must be imposed in "'the full amount of each victim's losses as determined by the court'" unless one of the exceptions applies. *Catoggio*, 326 F.3d at 326 (*quoting* 18 U.S.C. § 3664(f)(1)(A)).

---

[2]By Order dated February 15, 2008, Judge Weinstein directed the Clerk of Court to assign a miscellaneous number for docketing entries that pertain to all nine defendants in what has come to be known as *In re Newsday Litigation*.

Co-conspirators may be held jointly and severally liable for restitution owed to the victims of the conspiracy. The governing statute grants a sentencing court discretion to "make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss." 18 U.S.C. § 3664(h). *See also U.S. v. Sensmeier*, 361 F.3d 982, 990 (7th Cir. 2004) (recognizing the discretionary nature of § 3664(h)); *U.S. v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) (noting that "[t]he court had the discretion to apportion the [restitution], but was not required to do so"). Thus, where, as here, several defendants are convicted of participating in a scheme, conspiracy, or pattern of criminal activity, each may be held liable, jointly and severally, for the full amount of losses caused by the scheme. *See U.S. v. Nucci*, 364 F.3d 419, 423-24 (2d Cir. 2004) (affirming district court's restitution order against defendant for full amount of loss, as opposed to apportioning each defendant's liability); *U.S. v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (noting that a court may "order a single defendant to pay restitution for all losses caused by the actions of that defendant as well as by the actions of that defendant's co-conspirators"); *U.S. v. Collins*, 209 F.3d 1, 4 (1st Cir. 1999) (holding that "[i]n the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators"); *U.S. v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999) (affirming district court's restitution order and finding defendant liable for all losses caused in furtherance of the conspiracy); *U.S. v. Plumley*, 993 F.2d 1140, 1142 (4th Cir. 1993) (same); *U.S. v. Bogart*, 490 F. Supp. 2d 885, 897 (S.D. Oh. 2007) (holding defendants jointly and severally liable for all of the

loses caused by their conspiracy).[3]

The government bears the burden of establishing the losses sustained by victims by a preponderance of the evidence. 18 U.S.C. § 3664(e). Inability to calculate losses precisely, however, does not preclude an order of restitution; rather, a court need only make a reasonable determination of the losses identifiable victims have sustained. As the Ninth Circuit has observed, "[t]he primary and overarching goal of the MVRA is to make victims of crime whole" and, "[i]n achieving this objective, Congress intended district courts to engage in an expedient and reasonable restitution process." *U.S. v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004). *See also U.S. v. Futrell*, 209 F.3d 1286, 1291-92 (11th Cir. 2000) (finding that restitution could be based on a "reasonable estimate" of the loss), *cited with approval in Catoggio*, 326 F.3d at 329; *U.S. v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993) (holding that, "so long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution"); *U.S. v. Fogel*, 494 F. Supp. 2d 136, 139 (D. Conn. 2007) (finding the "Government's methodology for computing restitution to be reasonable"); 18 U.S.C. § 3664(a) (requiring a probation officer to make reasonable efforts to ascertain the number and identity of the victims).

## B. Prior Proceedings

On September 24, 2007, Judge Weinstein issued an "Order Prior to Sentence." Docket Entry 19 in 05-CR-747. In his Order, Judge Weinstein directed the government to state whether

---

[3]One defendant, Richard Czark, argues that his share of any restitution ordered by the court should be reduced in light of his minimal role in the circulation fraud. Docket Entry 41 in 08-MC-096. However, as indicated in the text, co-conspirators are generally held jointly and severally liable for restitution. In any event, assessments of the relative culpability of the various defendants is beyond the scope of this report.

or not it would be seeking restitution and, if not, to submit a certification to that effect.   By

Order dated December 17, 2007, Judge Weinstein pointed out that he had not received any

response to his prior order seeking the government's position on whether restitution should be

imposed.  Docket Entry 10 in 05-CR-747.  The Order went on to ask the government for its

position on whether any payments made by Tribune, Newsday and Hoy to the fraud victims

affected the court's obligation to order restitution under the MVRA.

The government filed its response on December 18, 2007, stating as follows:

> To date, according to representations by Tribune Company's
> counsel, approximately $90 million has been repaid [to circulation
> fraud victims].  The terms of the agreement with the United States
> Attorney's Office specify that any additional advertisers not
> identified previously may apply to the Department of Justice for
> restitution to be supplied from the [$15 million] forfeited amount.
> In light of this mechanism and the difficulty in determining
> whether additional restitution is owed to any victims who have yet
> to come forward beyond this mechanism, the government
> respectfully submits that pursuant to 18 U.S.C. § 3663A(c)(3)
> restitution should not be ordered against the nine individual
> defendants.[4]

Docket Entry 12 in 05-CR-747.   On December 21, 2007, Judge Weinstein issued an "Amended

Memorandum and Order Regarding Restitution."  Docket Entry 15 in 05-CR-747.  In his

Amended Memorandum and Order, Judge Weinstein reviewed the statutory framework

governing restitution and, with respect to the government's contention that restitution should not

be ordered, responded as follows:

> Based on the present record, the court does not find that the

---

[4]As part of their cooperation agreements, the following defendants have agreed to forfeit
proceeds of the fraud to the United States: Brennan, $90,000; Sito, $100,000; Acosta, $50,000;
and Faiella, $50,000.  In addition, each defendant is subject to a fine of up to $250,000.

> number of victims is so large as to make restitution impracticable
> or that determining complex issues of fact would complicate or
> prolong the sentencing process to a degree that the need to provide
> restitution to any victim is outweighed by the burden on the
> sentencing process.  The parties may seek to add to the record in an
> attempt to establish 18 U.S.C. § 3363A(c)(3)(A) or (B).  Until that
> record is made, the restitution process shall go forward.

*Id*. at 11.  Judge Weinstein then referred to me the task of determining whether the victims of the circulation fraud could be identified and the amounts they lost determined.  Docket Entry 16 in 05-CR-747.

I first met with the parties pursuant to Judge Weinstein's referral on December 20, 2007.  *See* Tr. of 12/20/07, Docket Entry 26 in 05-CR-747.  Representatives of Newsday, Hoy and Tribune, and of certain advertiser-victims, were present as well.  During that conference, I set a schedule calling for Newsday and Hoy to submit an affidavit describing how they identified the victims of the circulation fraud and determined what amounts to offer each of them.  I also directed the government to submit a brief addressing the various legal questions raised by Judge Weinstein, including whether the payments made by Newsday and Hoy should be "counted" towards the restitution obligations of the nine individual defendants.  Finally, I indicated that defendants and victims would have an opportunity to submit memoranda to the court as well.

## C.  Refunds Paid to Advertisers by Newsday and Hoy

Newsday and Hoy have submitted an affidavit of Carl DeMarco, Revenue Accounting Manager in the Finance Department of Newsday.  Docket Entry 29 in 05-CR-747.[5]  According to DeMarco's affidavit, Tribune first became aware that the circulation figures for Newsday and

---

[5]The government did not submit a memorandum of law until substantially later.  *See* Docket Entry 36 in 08-MC-096.

Hoy might not be accurate in early 2004 when it received a draft civil complaint prepared on behalf of a group of advertisers. DeMarco Aff. ¶ 2. This led Tribune to conduct an internal audit. *Id.* At or about the same time, the Audit Bureau of Circulations, or "ABC" – a not-for-profit organization that receives payments from various publishers, including Newsday and Hoy and its competitors, and has advertisers as well as publishers on its board – expanded what had been a routine audit of Newsday's circulation. DeMarco Aff. ¶ 3; Tr. of 1/29/08 at 44. Tribune's internal audit staff and ABC's audit personnel regularly shared information. DeMarco Aff. ¶ 3.

As the audits were progressing, DeMarco and others at Newsday began to design a procedure for compensating Newsday and Hoy advertisers for what came to be referred to as "disallowed circulation," or the amount of claimed paid circulation determined to be fraudulent. *Id.* ¶ 4. This process ultimately identified approximately 59,000 commercial advertisers who paid for advertisements in Newsday and 4,000 who paid for ads in Hoy from January 1, 2002 through September 30, 2004. *Id.* ¶¶ 4, 18. In addition, DeMarco and his co-workers calculated that about 429,000 private-party classified ads were placed in Newsday during this time period, although the identity of these private parties was not determined. *Id.* ¶ 4.

Newsday and Hoy offered refunds to each of the commercial advertisers they identified in amounts they calculated based upon the disallowed circulation determined by the audits. *Id.* ¶¶ 6, 16. For the time period from January 1, 2002 to March 31, 2004, advertisers were offered a percentage of what they had paid for advertising equal to the percentage of circulation that was disallowed; in other words, for every one percent by which paid circulation had been fraudulently overstated, Newsday offered to refund one percent of the amount spent on advertising. *Id.* ¶¶ 7-

8.[6]  For the period from April 1, 2004 through September 30, 2004, a different calculation was used: some advertisers were afforded retroactive application of new, lower advertising rates implemented in September and October of 2004, and some were offered refund amounts extrapolated from the percentages calculated for the earlier period.  *Id.* ¶ 12.  Newsday and Hoy did not offer any refunds for the period prior to January 1, 2002, although they acknowledge that the circulation fraud began before that date.  Newsday and Hoy contend that they did not offer refunds for this earlier period because they lacked adequate circulation data to make reliable estimates of the losses sustained by advertisers prior to January 1, 2002.  *Id.* ¶ 9.

Newsday and Hoy set aside $90 million to compensate advertisers who overpaid as a result of the circulation fraud.  As of March 21, 2008, 60,698 advertisers had been identified and offers totaling more than $80 million had been extended to them.  Schedule Submitted by Tribune for *in camera* review by cover letter dated March 21, 2008.[7]  To receive payment, advertisers were required to release any claims they had against Newsday or Hoy related to advertising fees.  *See* Letter submitted by Tribune dated June 10, 2008, Docket Entry 27 in 08-MC-096.  The overwhelming majority of the offers (in terms of dollar amounts) were, after some negotiation, accepted, resulting in $96,635,000 in payments by Newsday and Hoy to 34,126 fraud victims.  Gov't Letter dated July 7, 2008 at 10, Docket Entry 36 in 08-MC-096.  30,724 advertisers, however, have either failed to respond to or refused offers of payments made by

---

[6]The process used to determine refund amounts at Hoy was similar but, because the data concerning Hoy's disallowed circulation was not as detailed, varied slightly.  DeMarco Aff. ¶¶ 16-17.

[7]This schedule was submitted *in camera* without objection from the government or any of the defendants because it identifies Newsday's and Hoy's largest advertisers and the specific amounts for which each settled its claims.

Newsday and Hoy in the total amount of $5,966,000.  *Id.*  The government points out that 14,500

of the 30,724 advertisers who failed to respond or refused payments were offered $25 or less.  *Id.*

at 10 n.3.

Newsday maintains a database listing the 59,000 commercial advertisers it identified and

the refund amounts offered to each of them.  *Id.* ¶ 20.  Hoy maintains a similar database.  *Id.*

These databases are available to be produced in readable form as directed by the court.  *Id.*

Newsday and Hoy took a different approach to compensating individuals who placed

classified ads during the fraud period.  In his affidavit, DeMarco identifies two reasons for the

difference.  First, the average amount spent by these individuals was relatively small, averaging

$65 to $75 per ad, and the fraud amount would obviously be only a small percentage of the $65

to $75 total.  Second, because the advertisers were individuals, Newsday and Hoy doubted that

the contact information they had available was sufficiently current to make it feasible to contact

them.  DeMarco Aff. ¶ 14.  Accordingly, rather than attempting to locate each person who placed

a classified ad and offer a small refund amount, Newsday offered *any* private individual –

whether or not he or she had placed an ad during the fraud period – a free two-line ad to run for

seven days.  This opportunity was advertised in Newsday on thirteen separate occasions, and

resulted in 6,300 individuals placing advertisements.  *Id.* ¶ 15.

**D.  The Romeo Report**

I held a second conference with the parties, as well as counsel for Newsday, Hoy and

Tribune and certain advertisers, on January 29, 2008.  Having reviewed the DeMarco affidavit

and after questioning counsel for Newsday, Hoy and Tribune about it, I asked the government "to

take an objective look at what Newsday and Hoy did" and to determine whether it agreed that the

amounts they paid reasonably approximated the amount of restitution due to the victims of the circulation fraud. Tr. of 1/29/08 at 27. I also noted some concerns I had about the methods used by Newsday and Hoy. For example, I pointed out that advertisers were only compensated for the period beginning January 1, 2002, even though the circulation fraud began earlier than that. *Id.* at 37. Although, as noted above, Newsday claims that it did not maintain sufficient circulation data to calculate the amount by which paid circulation was overstated prior to January 1, 2002, I questioned why losses sustained during the earlier period could not be calculated by extrapolating from the period for which adequate data exists. *Id.*

At the close of the conference, the government sought the opportunity to retain an expert to opine on the reasonableness of the compensation amounts calculated by Newsday and Hoy. *Id.* at 49. The government ultimately decided to have the Economic Analysis Group ("EAG"), a unit within the Antitrust Division of the Department of Justice, evaluate the methodology used by Newsday and Hoy to compensate victims of the circulation fraud. By Order dated March 19, 2008, I set a schedule for the submission of the government's report and any responses or comments from the defendants or victims. Docket Entry 7 in 08-MC-096. I also directed the government to post the order on a web site it maintains in connection with this matter, and to publish a copy of the Order in Newsday. *Id.*

On April 30, 2008, the government submitted a preliminary report prepared by Dr. Charles Romeo, an economist working for the EAG. Docket Entry 13 in 08-MC-096. Dr. Romeo, who holds a Ph. D. in Economics, served as an Assistant Professor of Economics at Rutgers University for nearly a decade, and has been a research economist with the EAG since 1999. Docket Entry 26 in 08-MC-096. On May 23, 2008, Dr. Romeo submitted a revised report

that he prepared after obtaining additional data that was not available to him at the time his original report was filed. Docket Entry 16 in 08-MC-096 ("Romeo Rept."). On June 6, 2008, I held a hearing at which Dr. Romeo testified, described the results of his analysis, and was available for questioning by the court, the defendants, and any victims who chose to attend. Only a handful of clarifying questions were posed by any defendant or victim, and no defendant, victim or interested party has submitted any response or challenge to the conclusions reached by Dr. Romeo in his report.

In his revised report and testimony, Dr. Romeo addressed two questions: first, whether the available data about the period from January 2002 to September 2004 provides a basis for determining when the circulation fraud started and what its scope was from when it began until January 1, 2002, and second, whether the payments made by Newsday and Hoy reasonably compensated advertisers for the losses they sustained as a result of the circulation fraud.[8]

As noted above, Newsday and Hoy offered refunds to advertisers for the period beginning January 1, 2002 but not before, even though the circulation fraud was already underway by that date. Dr. Romeo examined the data to see whether extrapolating trends in the amount of circulation fraud backwards in time could provide a reliable estimate of when the circulation fraud began. Romeo Rept. at 2 *et seq.* In analyzing the data, Dr. Romeo separately considered home delivery fraud – the overstatement of sales of home subscriptions – and single copy fraud – the overstatement of sales by stores and newsstands selling individual copies. Because the size of the circulation fraud was variable rather than linear, Dr. Romeo was unable to determine when

---

[8]Dr. Romeo reached conclusions only with respect to Newsday because he did not have sufficient data to analyze the fraud related to Hoy. Romeo Rept. at 2 n.3.

the fraud began simply by extending trends in the data reflecting the amount of the fraud.

Nevertheless, Dr. Romeo was able to reach some tentative conclusions about when the fraud began by considering the timing of changes in the rules promulgated by the ABC to measure circulation and whether reported circulation was jumping sharply, remaining steady, or declining at the time. Romeo Rept. at 4 *et seq.* Dr. Romeo observed that Newsday's circulation figures for educational programs increased markedly in 2000 and 2001, and that single copy sales rose sharply in 2001 and again in 2002. Home delivery sales, in contrast, declined markedly from 2000 to 2001, and the drop in circulation did not begin to slow until late in 2001. Moreover, in March of 2001, ABC changed its rules to allow home delivery sales made at 25% of the paper's regular price to be included as paid circulation, whereas only home delivery sales made at 50% of regular price were permitted previously. Yet, home delivery sales at 25 to 50% of regular prices accounted for less than 2,000 of almost 350,000 home delivery sales reported in 2001, but more than 43,000 of approximately 350,000 copies reported sold in 2002. Romeo Rept. Table 2. From these changes, Dr. Romeo reasonably infers that single copy fraud was likely underway by early 2001, but that home delivery fraud was likely only beginning in late 2001 and did not "ramp up" until 2002. Romeo Rept. at 7-8. Moreover, by simply measuring the amount of disallowed circulation in each category during times when data reflecting both are available, Dr. Romeo concluded that single copy sales accounted for a substantially larger portion of the circulation fraud than home delivery sales. Romeo Rept. at 9 n.15, 10.

Dr. Romeo next attempted to measure whether advertisers were adequately compensated by Newsday's and Hoy's offer of refunds at rates equivalent to the amount of circulation fraud – that is, refunds of one percent of advertising expenses for each percentage point by which

circulation was fraudulently overstated. To answer this question, Romeo obtained historical advertising revenue and circulation data from Newsday and developed a statistical model designed to measure the correlation between them.[9] *Id.* at 8 *et seq.* Dr. Romeo's results assumed that the data obtained from Newsday, including data about the size of the circulation fraud, was accurate. As discussed above, however, Newsday's data fails to account for any fraud at all for the period prior to January 1, 2002, DeMarco Aff. ¶ 9, or for any home delivery fraud for the period prior to October 1, 2002, Romeo Rept. at 3-4.

Based upon the Newsday data, and limiting himself to the time period it covered, Romeo concluded that advertisers were *more than* adequately compensated for the circulation fraud. Romeo's statistical model indicated that, as circulation rises, advertising revenues rise as well, but at a slower rate; for every percentage increase in circulation, advertising rates go up only .45 to .65 percent. *Id.* at 12; Tr. of 6/6/08 at 30. Based upon his regression analysis, Romeo also concluded that changes in home delivery sales have a substantially greater impact on advertising revenues than do changes in single copy sales. Romeo Rept. at 11.

According to Romeo's measurements, and assuming no circulation fraud prior to January 1, 2002 and no home delivery fraud prior to October 1, 2002, the refunds paid by Newsday were between 155 and 225 percent of the losses sustained by advertisers as a result of the circulation fraud. *Id.* at 12. In other words, according to Dr. Romeo, for the time period described above, victims of the circulation fraud have been offered amounts that are between one-and-one half and

---

[9]Romeo employed a methodology similar to that used in the one known attempt by an academic to measure the correlation between circulation and advertising rates. Romeo Rept. at 2 n.2, citing Picard, *A Note on the Relations Between Circulation Size and Newspaper Advertising Rates*, THE JOURNAL OF MEDIA ECONOMICS (1998).

two-and-one-quarter times their losses.

**E. Information Provided by Defendants in Debriefings by the Prosecution**

As indicated above, eight of the nine defendants have cooperated with the government's investigation. During the hearing held on June 6, 2008, I asked the government to supplement its presentation to the court by drawing upon the information it obtained from the defendants' cooperation. Tr. of 6/6/08 at 10-12, 44.

In its letter of July 7, 2008, the government responds to my request. The government's letter provides no details about the debriefings of particular defendants, but does assert that the information developed during its investigation is consistent with the conclusions reached by Dr. Romeo about the scope and time period of the circulation fraud. Gov't Letter dated July 7, 2008 at 3, Docket Entry 36 in 08-MC-096.

**F. Submissions by Victims**

The MVRA requires that victims be notified of the scheduled date and time of sentencing proceedings and provided with an opportunity to submit information concerning their losses. 18 U.S.C. § 3664(d)(2)(A)(iii). In compliance with the MVRA, there has been ample notice to the victims of the proceedings and opportunities for them to come forward and inform the court of the losses they suffered as a result of the circulation fraud.

I held conferences on December 20, 2007, January 29, 2008, and June 6, 2008, which were, of course, open to the public. The docket sheets in the criminal actions and the above-captioned miscellaneous case provided notice of the conference dates. Moreover, in a Status Report & Order I issued on March 19, 2008, I proposed a schedule for submissions on the issue of restitution, including an invitation for comments from victims or other interested parties.

Docket Entry 7 in 08-MC-096. As I directed, the government published the Status Report and

Order in the March 28, 2008 edition of Newsday at D56. In addition, there have been articles in

Newsday reporting on the status of the proceedings. *See* Robert E. Kessler, *$15M Payment for*

*Newsday Violations*, NEWSDAY, Dec. 19, 2007, at A08; Robert E. Kessler & James T. Madore,

*Judge's Question: Where's the Boss?*, NEWSDAY, Dec. 21, 2007, at A02; Robert E. Kessler, *Will*

*Newsday Ex-Execs Pay for Scandal*, NEWSDAY, Jan. 30, 2008, at A45. Finally, the government

posted the March 19, 2008 Status Report & Order on the victim web site maintained by the U.S.

Attorney's Office for the Eastern District of New York. *See http://www.usdoj.gov/usao/nye*.

Accordingly, there has been ample notice and opportunity for any victims to be heard.

Only one group of victims – a number of automobile dealer advertisers who are plaintiffs

in *Arnold Chevrolet LLC v. The Tribune Co.*, 04-Civ-3097 (E.D.N.Y.) (DRH) – was represented

at the conference held on January 29, 2008. Tr. of 1/29/08 at 41-48. These car dealers submitted

a Memorandum concluding that the payments made to victims did not adequately compensate

their losses. Docket Entry 30 in 05-CR-747.[10] The case brought by the car dealers subsequently

settled, and the dealers have elected not to participate further in challenging the payments offered

by Newsday and Hoy as inadequate to compensate the victims of the circulation fraud. *See* Gov't

Letter dated March 7, 2008, Docket Entry 41 in 05-CR-747 (reporting that counsel for the

---

[10]In their memorandum, the automobile dealers relied on a report by their own expert, Dr. Smith. There appear to be several reasons for the different conclusions reached by Dr. Romeo and Dr. Smith. First, as noted above, Dr. Romeo's regression analysis indicated that, for every percentage increase in circulation, advertising rates go up only .45 to .65 percent; Dr. Smith concluded that rates go up .79 percent for every percentage increase in circulation. *See* Memorandum (Docket Entry 30 in 05-CR-747) at 8. Dr. Smith also assumed a larger fraud over a longer period of time, and added interest to his loss calculations. The automobile dealers did not submit Dr. Smith's report, but summarized his conclusions in their memorandum.

automobile dealers "has declined to provide any data underlying the expert report he submitted and has now settled the actions he filed against Newsday on behalf of his clients"). Presumably, represented by capable counsel, these automobile dealers received amounts in settlement that reasonably compensated them for the amounts they lost as a result of the circulation fraud.

Although another group of advertisers has filed a lawsuit that remains pending, *Crab House of Douglaston v. Tribune*, 04-CV-558 (E.D.N.Y.) (DRH), these plaintiffs have neither submitted any memoranda to the court nor attended any of the conferences I have held. They have, however, submitted a letter dated June 12, 2008, and a series of schedules. Giaimo Letter dated June 12, 2008, Docket Entry 44 in 05-CR-747. Although I find it difficult to discern the precise amount claimed by these advertisers, it seems they contend that they are owed approximately $10,000,000 in advertising fees and $7,721,000 in interest. *Id*. at 2. The schedules submitted by the *Crab House* plaintiffs assume that the circulation fraud began in 1995, five years earlier than indicated in the charging instruments in this case, and that circulation was consistently overstated throughout the fraud period by 15 to 25 percent. No evidentiary support is offered for these assumptions. The schedules also include interest at 9% per annum. Moreover, despite the ample notice provided, these plaintiffs did not appear at the hearing held on June 6, 2008, and have not made any additional submission responding to Dr. Romeo's report or the government's letter of July 7, 2008. In any event, the amount they seek – at least without the interest – is not very different, in light of the magnitude of the total amounts in issue, from the approximately $6,000,000 in offers by Newsday and Hoy that have not been accepted by advertisers. Finally, the cover letter submitted with the schedules states that the plaintiffs are in the midst of ongoing settlement discussions with Newsday. *Id*. For all these

reasons, I afford the June 12 submission from the *Crab House* plaintiffs little or no weight in my analysis.

The only "victim" who did attend the proceeding held on June 6, 2008 was Gerard Schultz. Schultz, a former manager in Newsday's Circulation Department, has filed a civil lawsuit against Tribune claiming that he was wrongfully discharged on September 2, 2004. *Schultz v. Tribune*, 06-CV-4800 (E.D.N.Y.) (FB), Am. Compl. ¶¶ 14, 163. Schultz's counsel has submitted a letter in response to my March 19, 2008 Order in which Schultz seeks restitution both as a "victim" and "whistleblower" of the circulation fraud. Pollack Letter dated May 11, 2008, Docket Entry 14 in 08-MC-096. A review of Schultz's complaint indicates, however, that Schultz claims that he was fired when Newsday refused to accommodate his disability and not because he "blew the whistle" on the circulation fraud. Am. Compl. ¶¶ 182-200 (alleging violations of the Family Medical Leave Act, Americans with Disabilities Act, Employee Retirement Income Security Act, and New York State Human Rights Law). Moreover, although Schultz alleges that he began "whistleblowing" in or about May of 1999, Am. Compl. ¶¶ 20-36, he was not terminated until more than five years later, after sustaining serious injuries in an automobile accident and while unable to work and out on disability leave, *id.* ¶ 152. Finally, Schultz acknowledges in his complaint that, after Tribune began investigating the circulation fraud, he was questioned by Tribune's lawyers and "did not divulge any information to these individuals," *id.* ¶¶ 138-39, and that Newsday's stated reason for firing him was that he lied to its lawyers, *id.* ¶ 168.

Under the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the" offense. 18 U.S.C. § 3663A(a)(2). Although the term "victim" is broadly defined

19

in the MVRA, "losses in which the amount of the victim's losses are speculative, or in which the victim's loss is *not clearly causally linked* to the offense, should not be subject to mandatory restitution."  S. Rep. No. 104-179, at 18-19, U.S.C.C.A.N. 1996, pp. 924, 932 (emphasis added), *cited in U.S. v. Serawop*, 505 F.3d 1112, 1119 (10th Cir. 2007).  Thus, where there are "highly complex issues related to the cause or amount of a victim's loss" that require a "determination of facts and issues better suited to civil proceedings," a mandatory restitution order is not appropriate.  *Id*.

Here, the reasons for Schultz's termination, as pleaded by Schultz himself, are not clearly tied to the circulation fraud.  Schultz could not have been fired for reporting the circulation fraud; he claims to have reported the fraud in 1999, but was not fired until 2004.  Moreover, according to Schultz, he was terminated because of his disability and, according to Newsday, because he lied to the attorneys retained by Tribune to investigate the circulation fraud.  As indicated above, Schultz himself admits lying to Tribune's attorneys; if any conduct related to the circulation fraud led to Schultz's termination, that undoubtedly was it.  An individual who helps to conceal a fraud cannot be considered its victim.  *See U.S. v. Reifler*, 446 F.3d 65, 125-27 (2d Cir. 2006) (vacating a restitution order that included losses suffered by co-conspirators and collaborators). For these reasons, Schultz's claim for restitution should be rejected.

No other victim or party has challenged the position that the compensation paid to victims to date is inadequate.[11]  This court's review is, as a result, undertaken without the benefit of a

---

[11]The court has received a letter seeking $1,259,282.61 in restitution on behalf of a reception hall and catering company.  Docket Entry 31 in 08-MC-096.  As the government points out, this amount is the total amount the two businesses spent on advertising from 1996 to 2004. Gov't Letter dated July 7, 2008 at 17.  From January 2002 to September 2004, these businesses spent approximately $196,500 on advertising in Newsday and Newsday made a refund offer of

meaningful adversarial presentation.

**G. Analysis**

Having carefully reviewed Dr. Romeo's report and closely observed his demeanor during the hearing on June 6, 2008, I find Dr. Romeo entirely credible and his reasoning quite persuasive. I was particularly impressed by how cautiously Dr. Romeo took pains not to overstate his expertise, the quality of the existing pertinent academic literature, or the quantity of data supporting his conclusions. Tr. of 6/6/08 at 19-20, 28. I therefore accept Dr. Romeo's opinion that, at least with respect to circulation fraud committed after January 1, 2002, it is reasonable to conclude that the refunds paid by Newsday reimbursed advertisers by approximately 155 to 225 percent of the losses they sustained. *Id*. at 12.

It may seem odd that Newsday and Hoy would have offered their advertisers more than they lost as a result of the circulation fraud. However, as discussed above, Dr. Romeo's analysis assumes no home delivery fraud prior to October 2002, and no circulation fraud in any category prior to January 1, 2002. Both assumptions are false, and were made solely because adequate data for the earlier time periods was not available. Second, the refund program administered by Newsday and Hoy was designed to restore the good will of its advertisers. It is therefore not surprising that its refund offers, upon close analysis, may have been more generous than the available data warranted. DeMarco Aff. ¶ 5.

Moreover, Dr. Romeo's conclusions are corroborated in two significant respects. First, although the government has not provided any meaningful supporting detail, it has represented

---

approximately $7,595. *Id.* The businesses fail to explain why $7,595 is not a sufficient amount in restitution to make them whole.

that the information developed during its investigation – including its debriefings of eight

cooperating defendants – is largely consistent with the assumptions made by Dr. Romeo about

the scope and duration of the fraud.  Second, advertisers have accepted offers of more than $96

million of the approximately $103 million in refunds offered by Newsday and Hoy, even though

they were required to tender releases to obtain the funds.  By letter dated March 21, 2008,

submitted to the court *in camera*, Newsday provided a list of its 350 largest advertisers, the

amounts offered to them, and the amounts for which they settled.  Many of these advertisers

accepted payments from Newsday totaling several hundred thousand dollars, and some received

in excess of one million dollars.  The advertisers include multi-national corporations and several

large retail chains, including department stores, automobile dealers and banks.  Had these

sophisticated entities concluded that the amounts offered by Newsday were insufficient

compensation for the circulation fraud, they – like the *Arnold Chevrolet* and *Crab House*

plaintiffs – could readily have mustered the resources to bring lawsuits, and the amounts at stake

would have warranted litigation.  Thus, the fact that the overwhelming majority of claims,

measured in dollars, were settled, is strong evidence that the amounts offered by Newsday and

Hoy were reasonable.

Although the amounts of the payments made by Newsday and Hoy are, for the reasons

stated above, reasonable, it is not entirely clear that these payments should be deducted from the

restitution amount imposed upon the defendants.  This is so because, as a general matter,

compensation received by victims "from insurance or any other source" is not considered in

determining the amount of restitution.  18 U.S.C. § 3664(f)(1)(B).  Rather, the MVRA provides

that "the court shall order that restitution be paid to the person who provided or is obligated to

provide . . . compensation," such as an insurer. 18 U.S.C. § 3664(j)(1). Although the extent to which the payments made by Newsday and Hoy should affect the amount of restitution imposed was not explicitly referred to me and I make no formal recommendation about it here, both the government and one of the defendants, Ed Smith, have addressed the question in their submissions to me. Gov't Letter dated July 7, 2008 at 12; Smith Letter dated July 10, 2008, Docket Entry 38 in 08-MC-096. I therefore consider the issue briefly.

An analysis of the effect of the Newsday and Hoy payments should begin from the premise that "the purpose of restitution is essentially compensatory." *U.S. v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006). Courts thus strive to avoid double recovery. *Id.* at 117. The Second Circuit, reasoning that, "[a]t common law, joint and several liability does not permit double recovery," has concluded that a court should deduct payments already made by co-defendants when determining the amount of restitution due. *Nucci*, 364 F.3d at 422-24. *See also U.S. v. Ruff*, 420 F.3d 772, 775-76 (8th Cir. 2005) (holding that, where a government agency was a victim entitled to restitution, amounts obtained through forfeiture proceedings should be deducted before the restitution amount was calculated); 18 U.S.C. § 3663A(b)(1)(B) (providing that the amount of restitution ordered should be reduced by the value of any property returned).

In *U.S. v. Dawson*, 250 F.3d 1048 (7th Cir. 2001), defendant, together with others, defrauded a hospital where she worked as a billing clerk of more than $175,000. Several of defendant's co-conspirators entered into a pre-trial diversion program and were not formally prosecuted. Defendant argued that any reimbursement payments made by these co-conspirators should be reduced from her restitution amount. Although no reimbursement had been made by the co-conspirators in the pre-trial diversion program at the time of defendant's appeal, the

Seventh Circuit "agree[d] with Dawson that Rush Hospital should not receive anything more in restitution than is required to make the hospital whole," and stated that, if payments were made by the unindicted co-conspirators, "we expect that the government would notify Dawson of the occurrence so that she could properly file a request for modification of restitution." 250 F.3d at 1050-51. Similarly here, as the government points out, "Newsday and Hoy, essentially, are pre-trial divertees who, in their agreement with the government, acknowledged liability for the same offense of which the individual defendants were convicted. . . . [They] are tantamount to unindicted co-conspirators for restitution computation purposes." Gov't Letter dated July 7, 2008 at 12. Thus, if the *Dawson* holding is applied here, the payments made by Newsday and Hoy to advertisers should be credited before calculating the amount of restitution to impose on the defendants.

As noted above, however, offers totaling $5,966,000 were made to 30,724 advertisers who either rejected or ignored them. Clearly, these victims have not been paid restitution for the circulation fraud. By Order dated July 9, 2008, I asked whether Newsday and Hoy would pay these advertisers even without obtaining releases in return. My order stated in pertinent part as follows:

> [The government] notes that 34,126 advertising victims have accepted payments from Newsday and Hoy in the amount of $96,635,000 and 30,724 advertisers have either failed to respond to or refused payments offered by Newsday and Hoy in the total amount of $5,966,000. Gov't Letter 10. These amounts were calculated by Newsday and Hoy as reasonable reimbursement for their fraud. It appears that those advertisers that refused payment or failed to respond did so because Newsday and Hoy required the advertisers to sign general releases in order to receive payment.

In its letter, the government points out that the Non-Prosecution Agreement "explicitly states that Newsday and Hoy acknowledge they 'violated federal criminal law by engaging in schemes that defrauded their advertisers, by systematically inflating paid circulation numbers reported in their books and records and falsely representing the accuracy of the inflated numbers to the Audit Bureau of Circulations ('ABC'), an industry organization . . . .'" *Id.* at 12. The government's letter goes on to describe Newsday and Hoy as "tantamount to unindicted co-conspirators." *Id.* Moreover, one of the reasons the government entered into the Non-Prosecution Agreement with Newsday and Hoy without requiring them to make restitution is that Newsday and Hoy had already made payments to victims, totaling over $83 million as of December 17, 2007. *Id.* Finally, the Non-Prosecution Agreement requires Newsday and Hoy to cooperate fully with the government investigation of the fraud.

Accordingly, the Court directs the government to inquire of Newsday and Hoy whether Newsday and Hoy are willing to tender payments to the 30,724 advertisers who have not yet been compensated for the fraud, without regard to whether these advertisers tender a release.

Docket Entry 37 in 08-MC-096. By letter dated July 15, 2008, Newsday and Hoy indicated that they are unwilling to make payments to any advertisers who have not agreed to execute a release. Docket Entry 42 in 08-MC-096.

According to the government, these uncompensated victims are identifiable, and a reasonable estimate of their losses has already been made; in fact, the government reports that Newsday and Hoy are in the process of compiling a list of these advertisers and the amounts of their losses, as calculated by Newsday and Hoy, for submission to the court. Gov't Letter dated July 7, 2008 at 13, Docket Entry 36 in 08-MC-096. There seems to be no reason not to direct the defendants to pay the $5,966,000 in estimated losses that remains due to the 30,724 advertisers

who have not accepted settlements from Newsday and Hoy.[12]

Defendants might protest that, according to Dr. Romeo's analysis, the $5,966,000 estimated by Newsday and Hoy overstates the losses sustained by advertisers. I recommend that any such argument, if it is made, be rejected. First, no interest has been attributed to any of the amounts calculated by Newsday and Hoy.[13] Second, no compensation has been offered for the time period prior to January 1, 2002, even though it is clear that the circulation fraud began earlier than that. Although, as the government points out, Newsday does not have detailed records regarding its advertisers during this period, it seems likely that many of the advertisers from the post-January 2002 period were also advertisers prior to that date. Gov't Letter dated July 7, 2008 at 10. Thus, to the extent that payments made for the post-January 2002 period overstate the amount of compensation owed for the circulation fraud, much of the overpayment is likely due for the earlier fraud period or as interest.

---

[12]As discussed in the text above, Newsday and Hoy have paid $15 million to settle a civil forfeiture action commenced by the United States. During proceedings before Senior United States District Judge Weinstein on December 20, 2007, the court inquired whether the forfeited funds are available to compensate victims. Transcript of proceedings before Judge Weinstein held on December 20, 2007 at 11-12. In its letter dated July 7, 2008, the government states that, under limited circumstances, forfeited funds may be made available to uncompensated victims. However, a victim seeking to recover forfeited funds must demonstrate, among other things, that there are no other assets reasonably available to provide a recovery. Gov't Letter dated July 7, 2008 at 13-15. It thus seems extremely unlikely that advertisers who have declined offers of payment made by Newsday and Hoy could successfully seek reimbursement from the forfeited funds held by the government.

[13]Restitution orders frequently provide for interest. *See U.S. v. Jimenez*, 513 F.3d 62, 87 (3rd Cir. 2008) (holding that pre-judgment interest was properly included in restitution order); *U.S. v. Simpson*, 8 F.3d 546, 552 (7th Cir. 1993) (finding that restitution order that included pre-judgment interest was proper to make victims whole under the predecessor statute to the MVRA); *U.S. v. Rochester*, 898 F.2d 971, 983 (5th Cir. 1990) (same); *see also U.S. v. Jaffe*, 314 F. Supp. 2d 216, 224-26 (S.D.N.Y. 2004) (discussing the appropriate pre-judgment interest rate to apply to restitution order).

Even if the restitution payments recommended in this Report are ordered and made, many victims will go uncompensated. As the government points out in its letter, Newsday and Hoy lack sufficient data about the amounts commercial advertisers paid for ads prior to January 1, 2002, and are unable to identify the individuals who placed classified advertisements during the fraud period. I have no reason to doubt the government's representations in this regard, particularly in light of the duty of cooperation undertaken by Newsday and Hoy pursuant to their agreement with the government.

The law does recognize that there are cases in which the victims cannot be identified or their losses calculated. *Catoggio*, 326 F.3d at 326. That seems to be the situation here with respect to individual classified advertisers and pre-January 2002 commercial advertisers. Moreover, any losses not already reimbursed by Newsday and Hoy and not included in the restitution order recommended above are likely to be minor. As pointed out above, logic and common sense suggest that many of the commercial entities that advertised in Newsday and Hoy before January 1, 2002 are likely to have continued advertising there after that date. Thus, the overpayments for the post-January 2002 period will likely compensate these advertisers, at least in large part, for the earlier circulation fraud period. Indeed, as discussed in detail above, Dr. Romeo reasonably concludes that, for the period from January 2002 through September 2004 – a period of two years and nine months – advertisers received refunds reflecting 155 to 225 percent of their losses. Assuming the fraud began in January of 2000 rather than January 2002 would result in a fraud period 173 percent as long as the one assumed by Dr. Romeo.[14] To the extent

_____

[14]The period from January 2002 through September 2004 is 33 months long. The period from January 2000 through September 2004 is 57 months long. 57/33 equals 1.73.

the home delivery fraud did not get underway until late 2001, this percentage likely overestimates the amount of fraud not taken into account by the January 2002 starting date.[15]  I therefore conclude that the refund amounts offered by Newsday and Hoy reasonably compensated those advertisers who accepted them for all of the losses they sustained as a result of the circulation fraud.  With respect to classified advertisers, some may have been compensated by Newsday's offer of a free ad, and the losses sustained by those who did not take out a free ad are likely to have been very small.  *See* Gov't Letter dated July 7, 2008 at 11 n.4.

For all these reasons, I respectfully recommend that defendants be directed to pay restitution to the 30,724 advertisers to be identified by the government in the amounts that Newsday and Hoy have already determined to be due them, totaling $5,966,000, and that no pre-judgment interest be awarded.  I further recommend that the court find that (1) any additional victims either cannot be identified, or that the calculation of their losses is, in effect, not practicable and that the losses, if they could be calculated, would likely be relatively small; and (2) therefore, that attempting to identify these victims or determine their losses "would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3).  I further recommend that Schultz's application for restitution be denied.

Any objections to this Report and Recommendation must be filed within ten days of this

---

[15]As discussed above, home delivery fraud was one aspect of the circulation fraud.  The home delivery fraud data available to Dr. Romeo began in October of 2002 rather than January of 2002.  Even so, the compensation for the post-January 2002 fraud was likely sufficient to cover the entire fraud period.  The period from October 2002 through September 2004 is 23 months long.  Assuming the home delivery fraud in fact began in October of 2001, it lasted for 35 months.  35/23 equals 1.52.

Report and in any event no later than August 6, 2008.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); FED. R. CRIM. P. 59; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

_____/s/_____
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
July 23, 2008